IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | CRIMINAL NO. 4:18-0240 |
| | § | |
| JULIAN BOCANEGRA-LUPIAN. | § | |

## **MEMORANDUM AND ORDER**

Before the Court in this illegal re-entry prosecution is Defendant Julian Bocanegra-Lupian's Motion to Dismiss Indictment ("Motion") [Doc. # 32]. The Government responded,[1] and Bocanegra-Lupian replied.[2] The Motion is ripe for decision. Based on the parties' briefing, pertinent matters of record, and relevant legal authority, the Court **denies** Bocanegra-Lupian's Motion.

## I. BACKGROUND

On November 13, 1980, Defendant Julian Bocanegra-Lupian, a citizen of Mexico, was admitted to the United States as a permanent resident at the age of eight.[3] On June 28, 1993, Bocanegra-Lupian pleaded guilty to two counts of first-degree murder and was sentenced to life in prison in the 248th District Court of Harris County, Texas.[4]

---

[1] United States' Response to Defendant's Motion to Dismiss Indictment ("Response") [Doc. # 39].

[2] Defendant's Reply to Government's Response to Defendant's Motion to Dismiss Indictment ("Reply") [Doc. # 40].

[3] Notice to Appear ("NTA") [Doc. # 39-1], at 3.

[4] Judgment on Plea of Guilty or Nolo Contendere Before Court – Waiver of Jury Trial [Doc. # 39-2].

On July 22, 1998, while serving his life sentence at a Texas Department of Criminal Justice ("TDCJ") prison in Huntsville, Texas, Bocanegra-Lupian was served by mail with a Notice to Appear ("NTA") regarding deportation proceedings.[5] The NTA did not contain a date, time, or location for the hearing.[6]

On August 22, 1999, Bocanegra-Lupian received personal service of a Notice of Hearing in Removal Proceedings ("NOH") with notice that a hearing would be held in his case on September 21, 1999, at 1:30 p.m. at the TDCJ prison where he was being held.[7] Bocanegra-Lupian appeared for his removal proceedings before the Immigration Court. Bocanegra-Lupian did not apply for any relief, and the Immigration Judge ("IJ") ordered him removed from the United States.[8] Bocanegra-Lupian waived appeal and never sought to challenge his removal order at the administrative level.[9] Bocanegra-Lupian reportedly was removed from the United States on August 10, 2012.[10]

On April 12, 2018, Bocanegra-Lupian was discovered by police in Baytown, Texas. On May 2, 2018, Bocanegra-Lupian was indicted for illegal reentry in violation of 8 U.S.C. § 1326.[11]

---

[5]   NTA at 1.

[6]   *Id.*

[7]   Notice of Hearing in Removal Proceedings ("NOH") [Doc. # 39-3].

[8]   Order of the Immigration Judge ("Removal Order") [Doc. # 39-4].

[9]   *Id.*

[10]  Motion at 4.

[11]  Indictment [Doc. # 1].

Bocanegra-Lupian moves to dismiss the indictment on several grounds. Bocanegra-Lupian contends the removal order was entered without subject matter jurisdiction because the relevant NTA failed to specify a date, time, and place for the removal proceedings. Bocanegra-Lupian submits that under federal statute, regulations, and the Supreme Court's recent decision in *Pereira v. Sessions*, NTAs *must* provide notice of the date and time of the removal proceedings to vest jurisdiction in the immigration court so that any ruling the IJ issues is valid. *See Pereira v. Sessions*, 138 S. Ct. 2105, 2110-14 (2018). Bocanegra-Lupian further contends that the removal proceedings were fundamentally unfair and failed to comport with due process because the IJ during those proceedings failed to advise him of his right to seek protection under the Convention Against Torture ("CAT") and because his guilty plea to the state crime which ultimately was the basis for his removal was predicated on erroneous legal advice that he would not lose his permanent resident status.

## II. <u>**LEGAL STANDARD**</u>

In order to prove illegal reentry, the Government must prove Bocanegra-Lupian "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding." 8 U.S.C. § 1326(a). Under 8 U.S.C. § 1326(d), a defendant may not collaterally attack the validity of his underlying removal order unless he demonstrates three separate factors: (1) he has exhausted any administrative remedies that may have been available to seek relief against the order; (2) the removal proceedings resulting in the order deprived the defendant of the opportunity for judicial review; and (3) the entry of the underlying order was fundamentally unfair. 8 U.S.C. § 1326(d); *United States v. Garrido*, 519 F. App'x 241, 242 (5th Cir. 2013) (per curiam); *United States v. Lopez-Ortiz*, 313 F.3d 225, 229 (5th Cir. 2002). The defendant must establish all three prongs to prevail; the

failure to prove one is fatal to his challenge. *See United States v. Mendoza-Mata*, 322 F.3d 829, 832 (5th Cir. 2003) (setting forth the same three factors as § 1326(d); *United States v. Cordova-Soto*, 804 F.3d 714, 718 (5th Cir. 2015).

## III. DISCUSSION

The Court concludes that Bocanegra-Lupian's three collateral attacks on the 1999 removal order are meritless, barred by § 1326(d), or both.

### A. Bocanegra-Lupian's *Pereira* Challenge Lacks Merit and Is Barred By § 1326(d)

Bocanegra-Lupian argues that his 1999 order of removal is void and thus cannot support an illegal reentry conviction. Bocanegra-Lupian's fundamental argument is that the IJ lacked subject matter jurisdiction to issue the removal order because the NTA failed to specify a date, time, and location for the removal proceedings. Bocanegra-Lupian submits that under federal statute, regulations, and the Supreme Court's recent decision in *Pereira*, NTAs *must* provide notice of the date, time, and location of the removal proceedings to be valid and to vest jurisdiction in the immigration court. District courts across the country have grappled with similar challenges and reached different conclusions. Bocanegra-Lupian's contentions are not persuasive.

#### 1. An Incomplete NTA Does Not Deprive the Immigration Court of Jurisdiction

As this Court has previously concluded,[12] the failure of an NTA to specify a date, time, and location of removal proceedings does not deprive an immigration

---

[12] This Court has previously refused to extend *Pereira* to dismiss an illegal reentry indictment based on a deficient NTA. *See United States v. Acevedo Araujo*, No. 4:19-046, 2019 WL 2161570, at *3 (S.D. Tex. May 17, 2019); *United States v. Castellanos*, No. 4:18-00592, 2019 WL 1879475, at *2-3 (S.D. Tex. Apr. 26, 2019); *United States v. Salas-Zuniga*, No. H-19-055, 2019 WL 1275563, at *1

(continued…)

court of subject matter jurisdiction. Subject matter jurisdiction refers to "the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998). Immigration judges derive their power from the Immigration and Naturalization Act ("INA"), which provides that "[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien." *See* 8 U.S.C. § 1229a(a)(1). The INA otherwise does not provide how or when jurisdiction vests with the immigration court for a particular removal proceeding. Rather, it gives immigration judges broad authority and flexibility in conducting hearings. *See id.* § 1229a(b)(1)-(2).

Though the "vesting of jurisdiction" with the immigration court is not referred to in the relevant immigration statutes, § 1229 does impose several procedural safeguards for persons subject to removal hearings. In removal proceedings, "written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien." *Id.* § 1229(a)(1). The NTA must specify, among other things, "[t]he time and place at which the proceedings will be held." *Id.* § 1229(a)(1)(G)(i). Satisfaction of these procedural requirements, however, is not a jurisdictional prerequisite. The Supreme Court has "repeatedly held that procedural rules . . . cabin a court's power only if Congress has 'clearly state[d]' as much." *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015) (alteration in original) (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 154 (2013)). "[A]bsent such a clear statement, . . . 'courts should treat the restriction as nonjurisdictional.'" *Auburn Reg'l*, 568 U.S. at 153 (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). Section 1229(a)(1) does not "clearly state[]"

---

(continued…)
(S.D. Tex. Mar. 20, 2019); *United States v. Lara-Martinez,* No. H-18-647, 2018 WL 6590798, at *2-3 (S.D. Tex. Dec. 14, 2018)

5

that its NTA requirements are jurisdictional. *See Kwai Fun Wong*, 135 S. Ct. at 1632. In light of Congress's omission of a clear statement specifying § 1229(a)'s requirements are jurisdictional, the Court must conclude that they are nonjurisdictional.

The *Pereira* decision does not compel a different result. *Pereira* did not address an illegal reentry charge under 8 U.S.C. § 1326, but instead involved the "narrow question" of application of the "stop-time rule" in connection with an application for cancellation of removal. *See* 138 S. Ct. at 2110. An individual subject to removal proceedings may be eligible for cancellation of removal if, among other things, he has been "physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [the] application" for cancellation. 8 U.S.C. § 1229(b)(1)(A). The "stop-time rule" provides that the period of continuous presence is deemed to end "when the alien is served a notice to appear under section 1229(a)." 8 U.S.C. § 1229(d)(1)(A). The Supreme Court in *Pereira* held that an NTA that does not include the date and time for the removal hearing does not constitute an NTA for purposes of the stop-time rule. *See* 138 S. Ct. at 2113-14. The *Pereira* case repeatedly stated it was addressing only the "narrow" question of the stop-time rule. *See id.* at 2113. That rule is a non-jurisdictional doctrine whose application may defeat an individual's eligibility for cancellation of removal. The Court did not state that any jurisdictional issues were involved in its decision, and the opinion did not address the IJ's authority to act. "Simply put, *Pereira* did not address the question of an immigration judge's jurisdiction to rule on an alien's removability . . . ." *See United States v. Perez-Arellano*, 756 F. App'x 291, 294 (4th Cir. 2018) (per curiam) (rejecting a *Pereira*-based challenge on plain error review).

This Court's conclusion that *Pereira* does not impose a new jurisdictional rule on IJs is buttressed by subsequent Fifth Circuit decisions. Following *Pereira*,

the Fifth Circuit stated in a footnote in a published opinion that the Supreme Court's *Pereira* decision applies to cancellation applications, not to other immigration proceedings. *See Mauricio-Benitez v. Sessions*, 908 F.3d 144, 148 n.1 (5th Cir. 2018); *see also Ramos-Portillo v. Barr*, 919 F.3d 955, 960 (5th Cir. 2019) ("[*Pereira*] has no bearing on this appeal, because *Pereira* concerned the stop-time rule for cancellation of removal and this appeal concerns reopening."). The Fifth Circuit in *Mauricio-Benitez* favorably cited district court cases holding that *Pereira* does not apply beyond the stop-time rule context. *See id.*[13]

Bocanegra-Lupian next cites regulations to support his argument that defects in NTAs go to the IJ's jurisdiction. The Code of Federal Regulations governing noncitizens' removal proceedings provides that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court . . . ." 8 C.F.R. § 1003.14(a). Bocanegra-Lupian contends that NTAs are just such charging documents, and thus, per the statutory definition of NTA provided by 8 U.S.C. § 1229(a), jurisdiction fails to vest in the absence of an NTA specifying the hearing's date, time, and location.

Bocanegra-Lupian's argument has three flaws. First, as previously noted, an immigration court's subject matter jurisdiction is its "*statutory* or *constitutional* power to adjudicate" a case. *See Steel Co.*, 523 U.S. at 89 (emphasis added). This

---

[13] The Court's conclusion that defects in NTAs are non-jurisdictional is supported to the extent an NTA is deemed similar to a criminal indictment. Like defects in indictments, which do not deprive a court of subject matter jurisdiction, defects in NTAs do not deprive the IJ of jurisdiction. *See United States v. Cotton*, 535 U.S. 625, 630-31 (2002) (holding that defects in indictment are not "jurisdictional"); *Lamar v. United States*, 240 U.S. 60, 64-65 (1916) (holding that an "objection that the indictment does not charge a crime against the United States goes only to the merits of the case," not subject matter jurisdiction); *United States v. Williams*, 341 U.S. 58, 66 (1951) (same).

7

power may not be enlarged or restrained by regulation. Thus, § 1003.14(a) does not impose a jurisdictional prerequisite.

Second, even if § 1003.14(a) validly circumscribes immigration courts' subject matter jurisdiction, the "charging document" refenced in 8 C.F.R. § 1003.14(a) does not necessarily refer to an NTA. Section 1003.13 defines "charging document" as "the written instrument which initiates a proceeding before an Immigration Judge." 8 C.F.R. § 1003.13. "For proceedings initiated after April 1, 1997, these documents *include* a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien." *Id.* (emphasis added). The definition of "charging document" is written inclusively and provides that multiple documents other than NTAs qualify as "charging documents." Therefore, the most natural reading of § 1003.14(a) is that the first filing of a recognized type of documents, for example an NOH, vests jurisdiction in the immigration court.

Third, even if "charging document" refers to an NTA, the applicable regulatory requirements for an NTA do not require that the NTA include the time and place for the removal proceeding. *See* 8 C.F.R. § 1003.15. The relevant regulations do not cross-reference § 1229(a)(1)'s definition of NTA. Rather, the regulations provide their own definition of NTA that does not include a requirement that the NTA state the hearing's date, time, and place. *See id.* § 1003.15(b) (listing several alternative requirements) Moreover, the regulation provides that "[f]ailure to provide any of these items shall not be construed as affording the alien any substantive or procedural rights." 8 C.F.R. § 1003.15(c) (emphasis added).

8

P:\ORDERS\1-CRIMIN\2018\240MDism.docx  190624.1556

## 2. Bocanegra-Lupian's Collateral Attack Is Barred by § 1326(d)

Bocanegra-Lupian's collateral attack is also barred by § 1326(d). Bocanegra-Lupian fails to demonstrate that the underlying proceedings were "fundamentally unfair" and does not satisfy § 1326(d)'s third prong. To demonstrate the underlying proceedings were "fundamentally unfair," a defendant must show "actual prejudice," meaning "there was a reasonable likelihood that but for the errors complained of the defendant would not have been deported." *See Mendoza-Mata*, 322 F.3d at 832 (quoting *United States v. Benitez-Villafuerte*, 186 F.3d 651, 659 (5th Cir. 1999)); *Garrido*, 519 F. App'x at 242 ("To show actual prejudice, the alien must establish that, but for the errors of which he complains, there is a reasonable likelihood that he would not have been deported."). The "errors complained of" here were the NTA's failure to specify the date, time, and location of an immigration hearing. However, Bocanegra-Lupian received notice of the hearing's date, time, and location through the NOH and appeared at the hearing.

Bocanegra-Lupian does not demonstrate, or even argue, that had he received an NTA with a hearing date, time, and location, he would not have been deported. Bocanegra-Lupian received notice of the removal hearing's date, time, and location via the NOH and was present at the hearing. There is no indication in the record that had the NTA included the date, time, and location for the removal hearing, the outcome would have been different. Bocanegra-Lupian does not demonstrate the entry of the removal order was fundamentally unfair. He is therefore barred from collaterally attacking his removal order. *Cf. United States v. Castellanos*, No. 4:18-00592, 2019 WL 1879475, at *2 (S.D. Tex. Apr. 26, 2019) (denying motion to dismiss indictment based on § 1326(d)'s bar when the defendant requested an expedited hearing, which was held with defendant present,

and nothing in the record indicated that, if the NTA had included the date and time, the proceeding would not have resulted in the defendant's removal); *United States v. Lara-Martinez*, No. H-18-647, 2018 WL 6590798, at *3 (S.D. Tex. Dec. 14, 2018) (same).

### B. Bocanegra-Lupian's CAT Challenge Is Barred

Bocanegra-Lupian argues his 1999 removal order was fundamentally unfair because he was eligible for relief under the CAT yet was not advised of his right to seek this protection. Under the CAT, "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. III, Feb. 4, 1985, 1465 U.N.T.S. 85. "[W]ith regard to the conduct complained of, applicants seeking relief under the [CAT] must satisfy a more rigorous standard than that for asylum." *Chen v. Gonzales*, 470 F.3d 1131, 1139 (5th Cir. 2006). "'[P]roof of torture, not simply persecution' is required." *Id.* (quoting *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2005)). "Torture is defined as any act by which severe pain or suffering . . . is intentionally inflicted on a person . . . for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). An applicant for relief under the CAT has the burden of demonstrating "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* § 208.16(c)(2).

Bocanegra-Lupian fails to show actual prejudice as a result of not being advised of his right to pursue relief under the CAT. Bocanegra-Lupian contends he had a legitimate fear of returning to Mexico based on the threats and persecution that his family was experiencing and, had he been advised of his rights

under the CAT, he would have applied for, and likely received, relief. Motion at 15. Bocanegra-Lupian represents that he "did in fact have a fear of torture upon his return (in 2012 after being released on parole) because members of the cartel (with permission of the Mexican authorities) were threatening and persecuting his family." Motion at 3.

First, Bocanegra-Lupian has not submitted any evidentiary proof that he would have been tortured if deported to Mexico. Even if the Court accepts Bocanegra-Lupian's unsworn representation, Bocanegra-Lupian fails to show that he would have been able to demonstrate during his *1999* removal proceeding that it was "more likely than not" that he would have been tortured if deported to Mexico. *See* 8 U.S.C. § 208.16(c)(2). To show actual prejudice, Bocanegra-Lupian "must show that he had plausible grounds for relief *at the time* of the challenged deportation." *See United States v. Rodriguez-Vasquez*, 4 F. Supp. 3d 1146, 1152 (N.D. Cal. 2013) (emphasis added). Bocanegra-Lupian's fears in 2012 are not sufficient to establish it was "more likely than not" when the IJ entered the removal order in 1999 that he would have faced torture with the acquiescence of the Mexican government if removed to Mexico. *Cf. id.* ("Thus, to succeed here, the defendant would have to establish that, in 2011, he had a claim that plausibly could have convinced an Immigration Judge that the defendant would more likely than not suffer torture if removed to Honduras.").

Because Bocanegra-Lupian fails to demonstrate actual prejudice from the IJ's failure to advise him of his rights under the CAT, Bocanegra-Lupian cannot overcome § 1326(d)'s bar on collateral attack of the removal order.

C. **Bocanegra-Lupian's Ineffective Assistance Challenge Is Barred**

Bocanegra-Lupian contends the entry of his 1999 removal order was fundamentally unfair because the removal order was predicated on a constitutionally deficient state conviction. According to Bocanegra-Lupian, his

11
P:\ORDERS\1-CRIMIN\2018\240MDism.docx  190624.1556

guilty plea to state murder charges was unlawful because it was obtained based on erroneous advice of counsel regarding his plea's potential immigration consequences. Bocanegra-Lupian contends his state criminal defense lawyer rendered ineffective assistance of counsel by misadvising him in 1993 that he would not be deported if he pleaded guilty because he was a legal permanent resident. Bocanegra-Lupian asserts that, had he been properly advised of the potential immigration consequences of a state murder conviction, he would not have pleaded guilty.

To demonstrate Bocanegra-Lupian's state criminal defense counsel misadvised him as to the potential immigration consequences of his plea, Bocanegra-Lupian introduces his own "voluntary statement,"[14] the statement of his mother, Doralicia Lupian,[15] and an affidavit from his state counsel who represented Bocanegra-Lupian during his state murder proceedings.[16] Bocanegra-Lupian states that he does not remember what his counsel told him regarding the immigration consequences of a guilty plea, but he believes he would remember if counsel told him he could be deported.[17] Doralicia Lupian states that at some point in 1993, she asked counsel whether Bocanegra-Lupian would be deported if he pleaded guilty.[18] According to Doralicia Lupian, counsel told her that Bocanegra-Lupian would not

---

[14] Voluntary Statement of Julian L. Bocanegra ("Bocanegra-Lupian's Statement") [Doc. # 36], at ECF 7.

[15] Voluntary Statement of Doralicia Lupian ("Doralicia Lupian's Statement" [Doc. # 36], at ECF 8.

[16] Affidavit of Steve Herbert ("Herbert's Affidavit") [Doc. # 36], at ECF 13.

[17] Bocanegra-Lupian's Statement at ECF 7.

[18] Doralicia Lupian's Statement at ECF 10.

be deported because he was a permanent resident and she should tell Bocanegra-Lupian to plead guilty.[19] Doralicia Lupian does not state whether she relayed the information to Bocanegra-Lupian or advised him to plead guilty. Bocanegra-Lupian's state counsel avers that he is not certain whether he discussed the immigration consequences of a plea with Bocanegra-Lupian.[20] He further states that "[t]he very nature of charges against [Bocanegra-Lupian] and the fact that the state was actively seeking the death penalty leads me to think that we probably never did discuss something that seems so minor and trivial when compared to the death penalty."[21] Counsel avers that he normally discusses the possibility of deportation with non-citizens he represents.[22]

Bocanegra-Lupian cites no authority that an illegal reentry defendant may collaterally attack his removal order by demonstrating his underlying criminal conviction resulted from ineffective assistance of counsel.[23] Even assuming an illegal reentry defendant can raise an ineffective assistance challenge to the

---

[19] *Id.*

[20] Herbert's Affidavit at ECF 16.

[21] *Id.* at ECF 15.

[22] *Id.* at ECF 16.

[23] The Seventh Circuit has held in an unpublished opinion that "the validity of . . . state convictions is beyond the permissible scope of collateral attack in the context of § 1326." *See United States v. Robledo-Gonzales*, 80 F. App'x 502, 504 (7th Cir. 2003). The Fifth Circuit in *United States v. Rodriguez-Perez*, an unpublished opinion, assumed without deciding that an illegal reentry conviction could be "unlawful because it is based on an order of removal which in turn is unlawful because it was based on a conviction resulting from ineffective assistance of counsel." 428 F. App'x 324, 328 (5th Cir. 2011) (per curiam).

conviction underlying his removal order, Bocanegra-Lupian fails to demonstrate his criminal defense counsel rendered ineffective assistance.

The Sixth Amendment guarantees criminal defendants "the right . . . to have the Assistance of Counsel for [their] defence." U.S. CONST. amend. VI. The right to counsel includes "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). "Under *Strickland*, a defendant who claims ineffective assistance of counsel must prove (1) 'that counsel's representation fell below an objective standard of reasonableness,' and (2) that any such deficiency was 'prejudicial to the defense.'" *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019) (internal citations omitted) (quoting *Strickland*, 397 U.S. at 687-88, 692).

To establish his state conviction was the result of ineffective assistance of counsel, Bocanegra-Lupian exclusively relies on *Rosa v. State*, No. 05-04-00558-CR, 2005 WL 2038175, at *4 (Tex. App.—Dallas Aug. 25, 2005, pet. ref'd).[24] There, Rosa, a citizen of El Salvador, successfully appealed his misdemeanor assault guilty plea, asserting his counsel erroneously advised him that pleading guilty would not result in deportation. *Id.* at *2. The Texas court held that trial counsel's misrepresentation of a plea's immigration consequences was unreasonable. *Id.* at *3. Importantly, the state court recognized that it was counsel's "erroneous advice"—not his "failure to admonish about the possibility of

---

[24] Bocanegra-Lupian expressly does not rely upon *Padilla v. Kentucky*, 549 U.S. 356 (2010), to establish state counsel's ineffectiveness. Reply at 10. In *Padilla*, the Court held that a criminal defense attorney generally renders deficient assistant when she does not "advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *See id.* at 369. The Supreme Court has held that *Padilla*'s 2010 holding is not retroactive, and thus "defendants whose convictions became final prior to *Padilla* . . . cannot benefit from its holding." *See Chaidez v. United States*, 568 U.S. 342, 358 (2013).

14

deportation"—that rendered his performance ineffective. *Id.* (citing *Perez v. State*, 31 S.W.3d 365, 367-68 (Tex. App.—San Antonio 2000, no pet.), and *Hernandez v. State*, 986 S.W.2d 817, 822-23 (Tex. App.—Austin 1999, pet. ref'd)).

The Texas court further held that counsel's error prejudiced Rosa because his "decision to plead guilty was a result of counsel's misinformation." *Id.* The court cited Rosa's upbringing (he came to the United States as a three-year-old and had lived here for 19 years) and his family's current location (his family lived in the United States, not in El Salvador) as evidence that maintaining legal status was of great importance to Rosa. *Id.* Moreover, the Court found that Rosa's original intent was to take his case to trial, as evidenced by his payment of a more expensive trial retainer, and that he only changed his mind after trial counsel's assurance that a guilty plea would not affect his immigration status. *Id.* Finally, Rosa testified that he would not have accepted the plea bargain had he understood the plea's potential effect on his immigration status. *Id.* Based on these factors, the Texas court held that Rosa was prejudiced by trial counsel's erroneous advice. *Id.*

Based on the benchmark set by *Rosa*, the only ineffective assistance case Bocanegra-Lupian cites or relies upon, Bocanegra-Lupian does not demonstrate trial counsel rendered constitutionally deficient assistance. Here, unlike in *Rosa*, the record does not support the conclusion that Bocanegra-Lupian's state criminal defense counsel *mis*advised Bocanegra-Lupian of the immigration consequences of his guilty plea. *See id.* Rather, the record evidence demonstrates that Bocanegra-Lupian's state counsel likely did not provide *any* advice with respect to the immigration consequences of a plea. Both Bocanegra-Lupian and counsel state they do not remember discussing potential immigration consequences. Doralicia Lupian states that counsel advised her that Bocanegra-Lupian would not be deported if he pleaded guilty, but she does not state whether she ever conveyed that

15

information to Bocanegra-Lupian. Accordingly, Bocanegra-Lupian fails to demonstrate trial counsel rendered deficient assistance.

Even assuming counsel misadvised Bocanegra-Lupian, he does not demonstrate that the erroneous advice was prejudicial, that is, caused him to plead guilty. Bocanegra-Lupian does not state that he would have gone to trial and risked being sentenced to death had he understood that he could be deported if he pleaded guilty. Moreover, unlike the defendant in *Rosa*, whose family lived in the United States and not El Salvador, Bocanegra-Lupian has not introduced evidence about the location of his family members in 1993. While Bocanegra-Lupian came to the United States at the age of eight and had lived here for 12 years at the time of his guilty plea, this fact alone does not suffice to demonstrate that Bocanegra-Lupian would have risked a trial and the death penalty had he understood the immigration consequences of a guilty plea.

Because Bocanegra-Lupian does not demonstrate state counsel's performance was deficient or prejudicial, he does not demonstrate his state murder conviction was unlawful or that the entry of a removal order predicated on that conviction was fundamentally unfair.

## IV. <u>**CONCLUSION AND ORDER**</u>

Bocanegra-Lupian's three collateral attacks on his 1999 removal order are either meritless, barred by § 1326(d), or both. It is therefore

**ORDERED** that Defendant Bocanegra-Lupian's Motion to Dismiss Indictment [Doc. # 32] is **DENIED**.

SIGNED at Houston, Texas, this <u>24</u>th day of **June, 2019.**

_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE